Filed 8/18/20 (unmodified opn. attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MEGHAN PASOS, | B291952 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS168166) |
| v. | |
| LOS ANGELES COUNTY CIVIL SERVICE COMMISSION, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING AND REQUEST TO DEPUBLISH |
| Defendant; | |
| LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, | NO CHANGE IN APPELLATE JUDGMENT |
| Real Party in Interest and Appellant. | |

THE COURT:*

The opinion in the above-entitled matter filed on July 27, 2020 is modified as follows:

On page 16, delete subheading B., and replace it with:

B.    *The Commission Did Not Abuse Its Discretion in Upholding Pasos's Discharge*

Respondent's petition for rehearing is denied.
Respondent's request to depublish the opinion is denied.
There is no change in the appellate judgment.

Filed 7/27/20 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MEGHAN PASOS, | B291952 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS168166) |
| v. | |
| LOS ANGELES COUNTY CIVIL SERVICE COMMISSION, | |
| Defendant; | |
| LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, | |
| Real Party in Interest and Appellant. | |

APPEAL from judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge. Reversed with directions.

Hausman & Sosa, Jeffrey M. Hausman and Larry D. Stratton for Real Party in Interest and Appellant.

The Gibbons Firm and Elizabeth J. Gibbons for Plaintiff and Respondent.

———————————————

The Los Angeles County Sheriff's Department (Department) discharged Deputy Sheriff Meghan Pasos based on her failure to report another deputy's use of force against an inmate and her failure to seek medical assistance for the inmate. During the Department's subsequent investigation Pasos admitted she did not report the use of force because she was concerned she would be "labeled as a rat" by her fellow deputies. The custody division's acting chief determined discharge was appropriate because Pasos's conduct in perpetuating a code of silence among deputies undermined the Department's operation of the jail and brought embarrassment to the Department. The Los Angeles County Civil Service Commission (Commission) affirmed the discharge, but the trial court granted Pasos's petition for writ of mandate and directed the Commission to set aside Pasos's discharge, award her back pay, and reconsider a lesser penalty. On appeal, the Department contends the trial court erred by substituting its own discretion for that of the Department in determining the appropriate penalty. We agree and reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Pasos's Employment*

The Department hired Pasos as a deputy sheriff on June 24, 2007. Beginning in November 2007, she worked at the

2

Men's Central Jail. In early 2010 Pasos was one of five deputies assigned to a floor that housed 1,200 inmates. Prior to the September 27, 2010 use of force incident, the Department had not taken any disciplinary action against Pasos.

B. *The September 27, 2010 Incident*[1]

At approximately 7:30 p.m. on September 27, 2010 commissary employee Anna Garcia informed Pasos, Deputy Omar Lopez, and Deputy Mark Montez that an inmate had stolen a bag of food items from the canteen. Garcia provided the deputies with a physical description of inmate Dequan Ballard. Lopez took Ballard to the elevator landing area outside the view of surveillance cameras, where he searched Ballard. Montez provided security; Pasos stood outside the landing as a lookout.

According to Lopez, during the strip search Ballard tensed up, so Lopez jabbed him once in the side of his stomach with the palm of Lopez's right hand.[2] Lopez found the bag of food on Ballard during the search. Ballard admitted to stealing the bag, and Lopez sent him back to his dormitory. On Ballard's return, he attempted to intimidate Garcia by accusing her of being a "snitch."

Garcia reported Ballard's threat to Montez and Pasos, who told Lopez. Lopez then pulled Ballard from his dormitory and took him to an area near the control booth outside the view of the surveillance cameras. Lopez placed a piece of paper over the

---

[1]    The facts are taken from the internal investigations and testimony before the Commission. Other than where indicated, the facts are not in dispute.

[2]    Pasos denied seeing Lopez or Montez hit Ballard during the strip search.

3

window on the door leading to the dormitory to prevent other inmates from seeing his interaction with Ballard. A custody assistant working in the control booth ordered the inmates in the dorm to get on their bunks. Pasos stood outside the control booth area and served as a lookout. According to the Internal Affairs Bureau (IAB) investigative summary, "Lopez then pushed Complainant Ballard's head against the wall, causing severe bleeding from his face, nose, and mouth areas." Ballard's blood soaked his clothing and splattered on the wall and the floor in front of the control booth. Lopez told the IAB investigators he pushed Ballard's face against the wall because Ballard made a "fast movement" towards him.

According to Pasos, she was not paying attention to the interaction between Lopez and Ballard because she was monitoring the inmates approaching the hallway area. She was standing four or five feet away from Lopez and Ballard with her back to them.[3] At some point she turned around and saw Ballard wipe his bloody nose. Pasos also saw blood on the wall and on Ballard's clothing. Pasos asked Lopez what happened, and Lopez told her he had shoved Ballard's head into the wall. Pasos told Lopez he "better handle the paperwork" and report his use of force. Lopez stated, "Don't worry about it, I will." Pasos responded, "Well, you better because you are on your own." Pasos left and continued with her shift.

Lopez left Ballard in the control booth area, then Lopez returned with a custody assistant and clean inmate clothing for Ballard. Ballard changed his clothing, and Lopez escorted him

---

[3] Pasos told the IAB investigators she was standing 10 feet away from Lopez and Ballard during the incident. But she later testified before the Commission she was four to five feet away.

4

back to his dorm room. Floor Sergeant Robert Jones walked into the area after the battery, but no one notified Sergeant Jones of the use of force. After the sergeant left, Lopez and the custody assistant kicked Ballard's bloody clothing away from the control booth area and down the hallway. Lopez directed a trusty[4] to clean the floor and wall area in front of the control booth. Lopez described the blood on the wall as "visible." Lopez and the trusty later threw Ballard's bloody clothing into the trash.

C.    *Ballard's Complaint and the Investigations*

At approximately 10:00 p.m. Ballard notified floor Sergeant Joseph Monarrez that he had been assaulted by Lopez and another deputy in the elevator landing, and again in the control booth area. Sergeant Monarrez observed a cut on the bridge of Ballard's nose and sent him to the clinic for medical treatment. A physician examined Ballard and treated him for his injuries. According to the IAB investigative summary, the medical records "indicate that the bridge of Complainant Ballard's nose was swollen with a 1/2 inch curved superficial laceration, his left lower lip was swollen and had been lacerated by his teeth, and he had large swelling underneath his right eye with a pinpoint superficial puncture in the center."

Sergeant Monarrez viewed the videos from the surveillance cameras, which corroborated Ballard's description of the deputies' actions. After discovering that none of the three deputies had reported the two incidents, Sergeant Monarrez notified the watch commander, who informed the commander captain. The

---

[4]    A trusty is an inmate who performs duties in the jail in return for privileges. (*Bradshaw v. Duffy* (1980) 104 Cal.App.3d 475, 478.)

5

commander captain requested the Internal Criminal Investigations Bureau (ICIB) conduct a criminal investigation.

After an investigation, the ICIB submitted the case to the district attorney's office for review. The district attorney's office declined to file felony charges. On June 14, 2012 the case was referred to the IAB for an administrative disposition.

D.     *Pasos's IAB Interview*

During her interview with the IAB investigators, Pasos stated Lopez told her he had shoved Ballard's head into the wall. Pasos explained, "At that point, I freaked out. I didn't know what the hell to do." Pasos stated Lopez put her "in a really bad position." She added, "And at that point, a million things are going through my mind. I felt like, 'Dude, I didn't—I didn't do this. Why did you even have to tell me? Like if this was something you were going to do, then keep that shit to yourself.' But I acted on impulse, I just honestly wanted to close my eyes and act like I didn't see shit. I didn't want to know anything. I just wanted to get out of there."

Pasos admitted she did not report the incident to a supervisor or write a report. Pasos explained, "It's kind of like I didn't want to be labeled as a rat. And just decided to keep my mouth shut. And I kick myself in the ass every day 'cause I'd much rather have that label right now than be in the position I'm in." Pasos later added, "[Lopez] always worked my shift and I always worked on his, and you know, I've never been put in that situation before. . . . [I]f he didn't want to take it upon himself to report his force that he used, I thought that if I stepped above him, and took it on myself and reported it, I was going to be ratting on him and I was afraid of the repercussions of, you know,

6

ratting on him with my partners . . . .  I just didn't report it.  I don't have an excuse."  Pasos stated at the conclusion of the interview, "I continued to work after this incident occurred and I truly learned my lesson."

E.     *Pasos's Discharge and Appeal to the Commission*

On April 2, 2013 Alexander R. Yim, chief of the custody division, made the initial decision to discharge Pasos.  A panel of three commanders from other divisions reviewed Pasos's case and agreed with Chief Yim's decision.  On April 8, 2013 the Department served Pasos with a letter of intent to discharge her, effective April 29, for failing to report the use of force and not seeking medical attention for Ballard despite observing Ballard bleeding from the nose and Lopez's disclosure he had pushed Ballard's head into a wall.  The letter concluded, "Your actions have brought discredit upon yourself and the Department."  The Department charged Pasos with multiple violations of the Department's Manual of Policy and Procedures (MPP) (1996), including sections 3-01/030.05 (general behavior), 3-01/050.10 (performance to standards), 3-01/030.10 (obedience to laws, regulations and orders), 3-10/100.00 (rev. 12/19/12) (use of force reporting and review procedures), and 3-01/040.97 (safeguarding persons in custody).

MPP section 3-01/030.05 (general behavior) states, "A member shall not act or behave privately or officially in such a manner as to bring discredit upon himself or the Department." MPP section 3-01/050.10 (performance to standards) provides, "Members shall maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions."  A member demonstrates a lack of competence by "[a]n

7

unwillingness or inability to perform assigned tasks" or a "[f]ailure to conform to work standards established for the member's rank or position."  MPP section 3-01/030.10 (rev. 5/22/11) (obedience to laws, regulations, and orders) provides for disciplinary action for violation of Department rules, regulations, or policies, including a written reprimand, suspension without pay, reduction in rank, and dismissal.

MPP section 3-10/100.00 (rev. 12/19/12) (use of force reporting and review procedures) requires deputies to notify their supervisors whenever they "witness[] reportable force used by another Department member."  The section also provides that a suspect must be transported to a medical facility for examination and treatment if the suspect "[s]trikes their head on a hard object, or sustains a blow to the head/face, as a result of the application of force by a Deputy, regardless of how minor any injury to the head/face may appear. . . ."  Section 3-10/040.97 (safeguarding persons in custody) provides, "Members having in their custody any person under arrest or detention shall properly safeguard such person and his property."

David Fender, who was then the acting chief of the Men's Central Jail, conducted a *Skelly*[5] hearing on April 29, 2013.  As the hearing officer, Acting Chief Fender reviewed the entire case file, including the interview transcripts and videos, investigation

---

[5]     In *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 215, the Supreme Court held a permanent civil service employee has due process rights to certain preremoval safeguards, including "notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline."

8

reports, and videos from the surveillance cameras. Acting Chief Fender determined discharge was the appropriate discipline. Pasos was discharged on May 7, 2013. Pasos appealed her discharge to the Commission.

F.    *Testimony Before the Commission's Hearing Officer*
    1.    *Acting Chief Fender's testimony*

Acting Chief Fender testified discharge was the appropriate discipline. He explained, "It was actually—it's a pretty troubling case and a very sad case, in that there was another deputy that caused the injury to this inmate. But when you look at the case and the facts, it was actually Ms. Pasos'[s] actions that are probably more egregious in the sense that it has to do with—with what the public is usually concerned about, and that's [the] code of silence. [¶] And that's something that's seen, and Deputy Pasos elected not to do anything about it, not report what she had seen to a supervisor. And basically hoped that either Lopez did what he said he was going to do and take full responsibility, or just hope that nothing ever came up. She walked away. But that's not what we expect of our employees." Acting Chief Fender added, "Seeing misconduct, and not reporting it to the supervisor and distancing herself, not taking responsibility, not caring for the inmate. . . . That's what people believe at times goes on in law enforcement, and that's something we do not stand for. [¶] When you have a situation like this, you have to take action. You have to discipline the employees, and you have to send a loud and clear message throughout the organization. This will not be tolerated."

Acting Chief Fender concluded Pasos violated the Department's general behavior policy by "not reporting

9

misconduct, walking away from a situation where an inmate was injured, [and] not ensuring that the inmate received medical care." He added, "[Pasos] created a situation that would bring embarrassment to the Department. [¶] The period of time that this incident plays out is also at a time the Department was under scrutiny by the public, by the [B]oard of [S]upervisors, as it turns out the FBI, believing that there was excessive force being used in Men's Central Jail. You know, it just added to the embarrassment that the Department was under at that time."

Acting Chief Fender also found Pasos violated the Department's performance to standards policy. Although Pasos did not see Lopez's use of force, "[s]he had enough information to know what happened." But "[s]he never questioned Deputy Lopez again. Never went back to him to see if he had reported it to a supervisor. Never bothered to check to see if the inmate received medical care." Acting Chief Fender added he might not have discharged Pasos if her failure to report force and to seek medical attention was simply an oversight or a training issue. But Pasos "was more concerned about repercussions from her peers being viewed as a rat, being viewed as a snitch, that was more of her concern."

Acting Chief Fender denied using Pasos to send a message. But he admitted, "We needed to send a message in how we dealt with code of silence issues, excessive force, unwarranted force. You know, what level discipline we were going to impose. It was like, zero tolerance."

Under the guidelines for discipline in effect at the time, the discipline for failing to safeguard an inmate ranged from a reprimand to a 10-day suspension. The discipline for failure to report witnessed force ranged from a suspension of five to 15

10

days. But discipline for violations of the performance to standards and general behavior policies ranged from a written reprimand to discharge.[6]

2. *Pasos's testimony*

Pasos testified she was "acting as [Lopez's] eyes" when she monitored the other inmates in the hallway. She was standing four to five feet away and had her back to Lopez and Ballard at the time of the battery and did not see or hear what was going on. At one point, she turned around and saw Ballard wipe his bloody nose. But Ballard did not turn and face Pasos, so Pasos did not see a fat lip or cut on his nose. She denied being present when Lopez gave Ballard new clothing, when Lopez asked a trusty to clean blood off the wall, or when the trusty cleaned up the blood. Pasos admitted she did not take Ballard to the clinic for a medical evaluation or check to see if he had been given medical assistance.

Lopez told Pasos he shoved Ballard's head into the wall, but she did not ask for any details. She explained, "I wasn't going to question my partner on why he used force or why he didn't use force. It is not my place to ask him the details of the force that he used. That's the supervisor's job. That if he used

---

[6] The guidelines provide that "[g]enerally, discipline will follow a 'progressive-step method.'" However, "[i]t is not necessary to have imposed each lower step of discipline prior to imposing a given level. Circumstances may call either for by-passing or imposing repetitive discipline." Further, "[f]ailure of an employee to perform his or her assigned duties so as to meet stated or implied standards of performance may constitute adequate grounds for suspension, reduction or discharge."

force he need[s] to report it." Pasos denied she had a duty to report if she was simply aware of the use of force, explaining, "My understanding of the force policy was if I physically used force on an inmate or I witnessed with my eyes that my partner was using force, then I needed to report force."

Pasos learned Lopez had not reported his use of force when she spoke with ICIB investigators by telephone the next morning. Pasos continued to work for a year on a different floor without any disciplinary issues. She received "very good" performance evaluations during the time periods before and after the incident.

Pasos was relieved from duty on October 4, 2011. She was surprised she was being discharged, stating, "I didn't see my partner use force. I didn't think that I needed to report my partner's force. And I didn't think I did anything wrong." She thought Lopez was going to report his use of force because he indicated he would and "it is common sense." As to her concern she "didn't want to be labeled as a rat," Pasos testified, "In my line of work, all we have is each other's word and each other's trust. And I never want to create a situation for my partner where I was going to report force that he used that I knew nothing about. [¶] I didn't want to just jump ahead of him and assume he wasn't going to report force and go report force to our supervisor and create a situation where now I could potentially get him in trouble when in all reality he was going to report his force, on his time."

### 3. *Sergeant Cheatham's testimony*

Sergeant Eric Cheatham testified as a character witness for Pasos. Cheatham was a postcertified force instructor who supervised Pasos in 2010 as the supervising line deputy.

Deputies were required to report if they used force or witnessed force. If deputies came after the use of force was over and observed injuries on an inmate, they were not required to report it. Cheatham testified, "[I]n my 23 years I have never heard of a deputy getting in trouble for that, for not reporting secondhand use of force which I believed occurred to [Pasos]."

Cheatham disagreed with the decision to discharge Pasos. He explained, "I don't think what occurred was right. And it was so—at the time at Men's Central Jail there was a political climate. It was like the Department was turned upside down on its head all the way going to the top from sheriff down. [¶] And so when deputies had incidents during this time period, they were judged swiftly and harshly. . . . Some deputies deserved to get that trouble and to be terminated. But I also think that there are some instances and hers in particular which is egregiously over correct was made in reference to her incident. [¶] . . . [¶] She was the best deputy on the floor. She was one of the hardest working deputies on the floor. And to my knowledge she had a flawless record. She had never been disciplined. I never disciplined her. She is my go-to person. She had a minimum of very good annual evaluations."

G.    *The Commission's Decision*

On April 12, 2016 the Commission's hearing officer issued his proposed findings of fact, conclusions of law and recommendation. The hearing officer found Pasos intentionally chose not to report Lopez's use of force and failed to seek medical attention for an injured inmate. Pasos did not report Lopez's use of force because she was "concerned about being considered a 'rat' or 'snitch' by her co-workers and the impact that may have on

relationships with her co-workers and shift partner." Further, Pasos's "actions w[ere] clearly a discredit to the Department as well as presented potential legal actions." The hearing officer found the Department met its burden to provide evidence Pasos violated the MPP for general behavior; performance to standards; obedience to laws, regulations and orders; use of force reporting and review procedures; and safeguarding persons in custody. The hearing officer concluded, "[I]t is clear that [Pasos's] behavior in this matter was so egregious that it merited the highest level of discipline available." The Commission adopted the hearing officer's findings of fact and sustained the Department's decision to discharge Pasos.

H.     *The Trial Court's Decision*

On February 16, 2017 Pasos filed a verified petition for writ of mandate in the superior court challenging her discharge. After a hearing, on May 3, 2018 the trial court granted the petition and ordered the Commission to set aside Pasos's discharge. The court found Pasos violated the Department's policies by failing to report the use of force and to obtain medical treatment for Ballard, bringing embarrassment to the Department. But the court concluded, "The Commission manifestly abused its discretion by upholding the Department's discharge of Pasos." The court reasoned, "The Department's desire to clean up inmate abuses at the jail is a legitimate and just operational consideration. It apparently is also true that the [c]ode of [s]ilence among deputies was creating problems for the Department's effort to do so." However, "[t]he Department—Chief Fender in particular—seemed to be caught up in the whirlwind of negative publicity about inmate abuse at the jail,

14

deciding to discharge every deputy involved in any aspect of an inmate abuse incident in order to deflect media and public criticism.  That was not his job.  As decision-maker, he was tasked with imposing a fair and appropriate discipline for Pasos's misconduct under the [g]uidelines, taking into account any potential adverse publicity for the Department, but also considering Pasos's actual misconduct.  He may not discharge employees out of departmental hysteria to avoid criticism."  On June 14, 2018 the trial court entered a judgment granting Pasos's petition for writ of mandate.

## DISCUSSION

A.    *Standard of Review*
"'[In] a mandamus proceeding to review an administrative order, the determination of the penalty by the administrative body will not be disturbed unless there has been an abuse of its discretion.'" (*Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 217 (*Skelly*); accord, *County of Los Angeles v. Civil Service Com. of County of Los Angeles* (2019) 40 Cal.App.5th 871, 877 (*County of Los Angeles*).)  "Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed." (*Barber v. State Personnel Bd.* (1976) 18 Cal.3d 395, 404; accord, *Bautista v. County of Los Angeles* (2010) 190 Cal.App.4th 869, 877 (*Bautista*); *County of Los Angeles*, at p. 877 ["The court may not substitute its own judgment for that of the Commission, nor 'disturb the agency's choice of penalty absent "'an arbitrary, capricious or patently abusive exercise of discretion'"' by the administrative agency' [citation], but must

15

uphold the penalty if there is any reasonable basis to sustain it."].)

"The appellate court conducts a de novo review of the penalty assessed, giving no deference to the trial court's determination." (*Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 46; accord, *Cate v. State Personnel Bd.* (2012) 204 Cal.App.4th 270, 284.) "Only in an exceptional case will an abuse of discretion be shown because reasonable minds cannot differ on the appropriate penalty." (*County of Los Angeles, supra*, 40 Cal.App.5th at p. 877; accord, *Bautista, supra*, 190 Cal.App.4th at p. 879.)

## B.     *The Department Did Not Abuse Its Discretion in Discharging Pasos*

Pasos contends the Department was required to follow its written guidelines for discipline and impose a lesser penalty than discharge. Under the Department's guidelines for discipline, the penalty for failure to report witnessed force ranges from a suspension of five to 15 days, and the penalty for failure to safeguard an inmate ranges from reprimand to a 10-day suspension. But Pasos's conduct went beyond a failure to report the force and to seek medical attention for Ballard. According to Acting Chief Fender, Pasos committed a more egregious violation of Department policy by perpetuating a code of silence among deputies in the jail, which encouraged other deputies to ignore their responsibilities and brought embarrassment to the Department. Thus, Pasos's conduct also violated the general behavior policy, which requires a deputy "not act or behave privately or officially in such a manner as to bring discredit upon

16

himself or the Department." Discipline for a violation of either of these policies ranges from a written reprimand to discharge.[7]

"In considering whether . . . abuse occurred in the context of public employee discipline, . . . the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[harm] to the public service.'" (*Skelly, supra*, 15 Cal.3d at p. 218; accord, *County of Los Angeles, supra*, 40 Cal.App.5th at p. 878 [same]; *Kolender v. San Diego County Civil Service Com.* (2005) 132 Cal.App.4th 716, 721 (*Kolender*) ["'The public is entitled to protection from unprofessional employees whose conduct places people at risk of injury and the government at risk of incurring liability.'"].) "Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." (*Skelly*, at p. 218; accord, *County of Los Angeles*, at p. 877.) "Whether an employee's conduct has resulted or is likely to result in harm to the public service if repeated requires consideration of the nature of the employee's profession, because 'some occupations such as law enforcement, carry responsibilities and limitations on personal freedom not imposed on those in other fields.'" (*County of Los Angeles*, at p. 878; accord, *Cate v. State Personnel Bd., supra*, 204 Cal.App.4th at p. 285.)

"'A deputy sheriff's job is a position of trust and the public has a right to the highest standard of behavior from those they

---

[7] Because we conclude the Department did not abuse its discretion in discharging Pasos based on her perpetuation of the code of silence in the jail, we do not reach whether the Department could have discharged Pasos under the general behavior policy or performance to standards policy based only on her failure to report the force and to seek medical attention.

invest with the power and authority of a law enforcement officer. Honesty, credibility and temperament are crucial to the proper performance of an officer's duties.'" (*Kolender, supra*, 132 Cal.App.4th at pp. 721; accord, *County of Los Angeles, supra*, 40 Cal.App.5th at p. 878 ["[p]eace officers specifically are held to higher standards of conduct than civilian employees"].) Law enforcement officers "'are the guardians of the peace and security of the community, and the efficiency of our whole system, designed for the purpose of maintaining law and order, depends upon the extent to which such officers perform their duties and are faithful to the trust reposed in them.'" (*Hankla v. Long Beach Civil Service Com.* (1995) 34 Cal.App.4th 1216, 1224 (*Hankla*); accord, *County of Los Angeles*, at p. 879.)

The Courts of Appeal have upheld the discharge of law enforcement officers where the officers' conduct resulted in harm to the public service. (See, e.g., *County of Los Angeles, supra*, 40 Cal.App.5th at pp. 878-879 [Commission abused its discretion in reducing deputy sheriff's discharge to 30-day suspension where deputy failed to report fellow deputy's use of force and lied during investigation];[8] *Cate v. State Personnel Bd., supra*, 204 Cal.App.4th at pp. 272, 285-287 [State Personnel Board abused its discretion in reducing correctional officer's dismissal to 30-day unpaid suspension where officer encouraged a mentally ill inmate to attempt suicide, altered the inmate's "bed card" to include self-serving statements, called a fellow officer a snitch,

---

[8]     *County of Los Angeles, supra*, 40 Cal.App.5th 871 involved the discipline imposed on Montez following his failure to report the use of force by Lopez against Ballard on September 27, 2010 and Montez's subsequent lie that he had not observed any injuries to Ballard.

and lied about his conduct]; *Kolender, supra*, 132 Cal.App.4th at pp. 721-722 [civil service commission abused its discretion in reducing deputy sheriff's penalty from dismissal to 90-day suspension where deputy lied about another deputy's physical abuse of an inmate]; *Hankla, supra*, 34 Cal.App.4th at pp. 1225-1226 [civil service commission abused its discretion in reducing police officer's discharge to suspension where off-duty officer engaged in unjustified traffic dispute, escalated argument, and recklessly discharged firearm]; *Talmo v. Civil Service Com.* (1991) 231 Cal.App.3d 210, 229 [upholding discharge of deputy sheriff who "committed battery on prisoners, made threats and racial slurs against a co-employee and . . . falsely denied these actions to his supervisors"]; *Paulino v. Civil Service Com.* (1985) 175 Cal.App.3d 962, 972 [upholding dismissal of deputy sheriff who made false statements about his health and sick leave usage]; *Flowers v. State Personnel Bd.* (1985) 174 Cal.App.3d 753, 756, 761 [upholding dismissal of correctional officer who "was dishonest, misused state property, and was insubordinate"].)

Our decision in *Bautista* is instructive. In *Bautista*, the Department discharged a deputy sheriff for engaging in a close personal relationship with a known heroin-addicted prostitute, in violation of the Department's prohibited-association policy. (*Bautista, supra*, 190 Cal.App.4th at p. 871.) In upholding the discharge, we considered the division chief's testimony that the deputy's "long-standing personal association with [the prostitute], along with her multiple detentions by the Gardena Police Department while he was with her, embarrassed the Department and undermined its reputation in both the law enforcement community and the public it is charged with protecting." (*Id.* at p. 878.) We rejected the deputy's contention the Commission

19

abused its discretion in upholding his termination, noting the Department's guidelines for discipline expressly stated discharge was the appropriate punishment. (*Id.* at p. 879.)

Similar to *Bautista*, Acting Chief Fender testified Pasos's conduct brought potential embarrassment to the Department and undermined its reputation with the public "at a time the Department was under scrutiny by the public." Acting Chief Fender described Pasos's conduct as furthering the code of silence at the Men's Central Jail, requiring the Department to take action, including disciplining the employees involved and sending "a loud and clear message throughout the organization [that t]his will not be tolerated."

Further, Pasos's conduct in following the code of silence undermined the Department's trust and confidence in Pasos as a deputy sheriff and negatively impacted the operation of the jail. As Acting Chief Fender explained, "[Y]ou have to expect that you've hired good credible people that are going to speak up when they see something wrong, or they see, in this case, force. They have to report it just like the individual that used it. And if they don't, then it opens the door for other people to violate policy, conduct themselves in a way that violates law, policy." As the court in *County of Los Angeles, supra*, 40 Cal.App.5th at page 880 observed, "It is simply intolerable that dishonesty and a culture of silence that countenances abuse of prisoners be permitted within the ranks of those charged with public safety and welfare."

In addition, at the Commission hearing Pasos minimized her responsibility to report the use of force, asserting she had no duty to report because she had not personally witnessed the battery. But Lopez admitted to Pasos he pushed Ballard's face into the wall; Ballard suffered "severe bleeding from his face,

20

nose, and mouth areas"; Pasos saw Ballard wipe blood from his nose; and she saw blood on the wall and on Ballard's clothing. There was so much blood from Ballard's injuries that Lopez had to bring him a change of clothes and enlist the assistance of a trusty to clean the blood off the floor and wall. Pasos testified she saw Ballard wipe his bloody nose, but somehow she did not see that he had a swollen lip, a cut on his nose, and "large swelling underneath his right eye." Notwithstanding the severity of the battery, Pasos stated at the Commission hearing, "I wasn't going to question my partner on why he used force or why he didn't use force. It is not my place to ask him the details of the force that he used. That's the supervisor's job. That if he used force he need[s] to report it." Pasos's claim she had no duty to report ran counter to her initial stated reason for not reporting the use of force—that she did not want to "rat" on her partner. As she explained, "I thought that if I stepped above him, and took it on myself and reported it, I was going to be ratting on him and I was afraid of the repercussions of, you know, ratting on him with my partners . . . ."

We recognize Pasos's conduct did not involve the level of dishonesty at issue in many law enforcement discharge cases, including *County of Los Angeles, supra*, 40 Cal.App.5th at pages 878 to 879, in which our colleagues in Division One found the Commission abused its discretion in reversing Montez's discharge for failure to report Lopez's use of force where Montez also lied about the incident during the investigation. Similarly, in *Kolender, supra*, 132 Cal.App.4th at page 722, the deputy was terminated because he was "complicit in covering up abuse of an inmate" by lying to protect a fellow deputy. Likewise, in *Talmo v. Civil Service Com., supra*, 231 Cal.App.3d at page 229, the

21

deputy was discharged because he committed battery on inmates, made threats and racial slurs towards fellow employees, and lied about his actions to his superiors. But we are not "free to substitute [our] discretion for that of the administrative agency concerning the degree of punishment imposed." (*Barber v. State Personnel Bd., supra*, 18 Cal.3d at p. 404; accord, *Bautista, supra*, 190 Cal.App.4th at p. 877.) Given the Department's reasoned explanation that discharge was necessary in light of Pasos's furtherance of the code of silence in the Men's Central Jail and the resulting embarrassment and loss of trust in the Department, this is not the "exceptional case" where "reasonable minds cannot differ on the appropriate penalty." (*County of Los Angeles*, at p. 877; accord, *Bautista*, at p. 879.)[9]

## DISPOSITION

The judgment is reversed. On remand the trial court shall enter a new judgment denying the petition for writ of mandate.

---

[9] The trial court faulted the Department for not considering as mitigation, among other factors, Pasos's lack of prior discipline and positive work with inmates for more than a year after the incident. But given Pasos's stated fear from the consequences of "ratting" on a fellow deputy and minimization of her responsibility to report the severe battery on Ballard, these factors do not demonstrate misconduct is unlikely to recur. (See *County of Los Angeles, supra*, 40 Cal.App.5th at pp. 880-881 [rejecting Commission's conclusion misconduct was unlikely to recur because deputy sheriff had "received ratings of 'Very Good' in his performance evaluations, including after the use of force incidents" and "continued to perform his duties at the jail for a year after the incident with no reports of abuse or misconduct"].)

The Los Angeles County Sheriff's Department is entitled to recover its costs on appeal.

 

 

                          FEUER, J.

We concur:

      PERLUSS, P. J.

      SEGAL, J.

---

 *     PERLUSS, P. J.      SEGAL, J.      FEUER, J.